UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 9/30/2020

RICHARD MOORE,

Plaintiff,

-against-

ANDREW M. SAUL, Commissioner of Social Security,

Defendant.

1:19-cv-04646 (ALC)

OPINION AND ORDER

ANDREW L. CARTER, JR., United States District Judge:

Plaintiff Richard Moore brings this action challenging the Commissioner of Social Security's ("Commissioner" or "Defendant") final decision that Moore was not entitled to supplemental security income ("SSI") under Title XVI of the Social Security Act and seeking remand for further administrative proceedings pursuant to 42 U.S.C. § 405 (g). Both parties have moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). ECF Nos. 12; 14. The Court has considered the Parties' submissions and for the reasons set forth below, Plaintiff's motion is **GRANTED,** and Defendant's motion is **DENIED**.

## BACKGROUND

1. Procedural Background

On August 17, 2015, Moore protectively filed an application for SSI, alleging disability beginning March 23, 2015. R at 85; 165.[1] Moore was born on March 23, 1964 and was 51 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed. R. at 20.

---

[1] "R" refers to the Certified Administrative Record filed at ECF No. 11. Pagination follows original pagination in the Certified Administrative Record.

Moore's claim was initially denied on February 25, 2016. R. at 10. Moore subsequently requested a hearing on March 24, 2016. R at 10. On December 13, 2017, a hearing was held before Administrative Law Judge ("ALJ") Brian W. Lemione. Moore appeared at that hearing pro se. Moore, Vocational Expert ("VE") Louis P. Szollosy, and Jennifer Burnley, Moore's girlfriend, testified. The ALJ issued an unfavorable decision on June 6, 2018. R at 7. Moore requested review of the ALJ's unfavorable decision on March 26, 2019, and the Social Security Administration Appeals Council denied review, making the ALJ's decision final. R at 1.

Moore brought this action following the denied request for reconsideration on May 20, 2019. Compl., ECF No. 1. On November 8, 2019, he moved for a judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). P's Mot., ECF No. 13. Defendant cross moved for judgment on the pleadings on January 7, 2020. D's Mot., ECF No. 15.

2.  Medical Evidence

    a.  Treatment History

Moore saw primary care physician Dr. Eunice Hoolihan on April 20, 2015, to establish care and for a follow-up after a hospital visit for an episode of food poisoning. R. at 256. Moore's physical examination results were normal. R. at 257. When Moore returned to Dr. Hoolihan on July 30, 2015, for a physical examination, Dr. Hoolihan noted that he was not taking his medications, but the physical examination results were unremarkable. R. at 246, 248.

On November 5, 2015, Moore fractured his hand in a car accident, and at that time EMS staff noted that he had a blood sugar level of 33 mg/dL. R. at 287. He reported he had been insulin-dependent since he was a teenager. R. at 289. Moore became alert after being treated with glucose by EMS and reported pain in his right hand and shoulder and that he had blacked out. R. at 276-77, 289. Right hand x-rays showed a fracture at the base of the second finger. R. at 280, 282.

Moore went to Orthopedics and Sports Medicine ("OSM") on November 9, 2015 and was seen by physician's assistant ("PA") Christopher Jones. R. at 325. Moore reported that he had last worked on November 14, 2015. R. at 325. He was unable to make a closed fist with his right hand due to swelling and stiffness and had difficulty gripping and grasping items. R. at 325. PA Jones noted reduced grip strength in his right wrist, moderate swelling and tenderness at the right index finger and thumb joint, and a slightly limited range of motion in the right index finger and thumb. R. at 327. X-rays showed a fracture at the base of the right second finger. R. at 327. There was also a nondisplaced fracture of his right thumb. R. at 328. PA Jones referred Moore to occupational therapy and recommended that Moore's activities be modified for twelve weeks to minimize the risk of re-injury. R. at 328. In a "work note" of the same date, Orthopedist Dr. Debra Parisi noted "no work for 6 weeks." R. at 331.

On November 23, 2015, PA Jones wrote a note reiterating that Moore should not work for six weeks and remarking that he would "need assistance with [activities of daily living] secondary to injury." R. at 334.

Moore saw Dr. Parisi on December 2, 2015. R. at 338. He was using a splint on his right second finger, and he reported pain, being unable to close his right pinky or make a fist, and stiffness in his right hand. R. at 338. Dr. Parisi noted slight improvement in symptoms with the splint and the absence of complaints of numbness or tingling. R. at 338. Moore's grip strength remained decreased and he had a limited range of motion in all fingers on the right hand, and he reported difficulty gripping and grasping items. R. at 228, 340. An x-ray confirmed that the fracture was healing. R. at 344. Dr. Parisi wrote a note indicating Moore would not be able to work until December 23, 2015. R. at 343.

Moore received occupational therapy for his right hand from December 7, 2015, to August 10, 2016, after which he had to stop therapy because of his work schedule. R. at 354 (12/30/15), 356 (12/24/15), 358 (12/21/15), 360 (12/7/15), 362 (12/11/15), 368 (1/6/16), 379 (2/8/16), 382 (2/11/16), 420 (4/13/16), 424-25 (4/22/16), 461 (6/28/16), 468 (7/15/16), 493 (8/10/16).

When Moore returned to Dr. Parisi on December 23, 2015, he had decreased right hand grip strength, no ecchymosis or obvious swelling, mild tenderness at the base of his index finger, a slightly limited range of motion in the index finger, and slightly decreased index finger strength. R. at 349. X-rays showed acceptable fracture alignment. R. at 349. Dr. Parisi advised Moore that he should return in four weeks and expect to work at that time. R. at 350, 352.

On December 26, 2015, Moore received Mobile Life Support Services through EMS, due to low blood sugar. R. at 506. he received a tube of oral glucose and refused a second, and he also received 150ml of intravenous dextrose. R. at 506. Moore's family advised that he was due to have an insulin pump implanted soon. R. at 506.

Dr. Parisi cleared Moore to return to full-duty work with no restrictions on January 20, 2016. R. at 371. He continued to have mild tenderness, slightly decreased strength, and a slightly limited range of motion in the index finger. R. at 373.

At a February 8, 2016 occupational therapy session, Moore reported right hand pain and increased stiffness since his last visit. R. at 379. An examination showed mild swelling of his index finger and right grip strength limited to five pounds, compared to thirty-five pounds on the left. R. at 380.

Moore returned to PA Jones on February 24, 2016. R. at 387. He reported an increase in right hand pain since he had stopped physical therapy and returned to work. R. at 387, 389. On examination, he had swelling, reduced grip strength, and slightly reduced range of motion in his

right index finger. R. at 388. X-rays taken on February 24, 2016, revealed degenerative changes in the small and ring fingers of his right hand. R. at 390.

Moore reported worsening right-hand pain to Dr. Parisi on March 18, 2016. R. at 401. He exhibited decreased grip strength and had a mildly positive nerve compression test, Tinel's sign, and Phalen's sign in the right wrist. R. at 403. Dr. Parisi's ordered electromyography ("EMG") and nerve conduction velocity ("NCV") studies of the right arm. R. at 404. Dr. Parisi also recommended that he avoid lifting over five pounds and limit use of his right hand but stated that Moore could do administrative work. R. at 404. X-rays that day showed well-healed fractures. R. at 409.

EMG/NCV studies of Moore's right arm taken on April 29, 2016, showed moderate right cubital syndrome and mild right carpal tunnel syndrome. R. at 427, 435. Dr. Parisi wrote on May 6, 2015, that Moore would be unable to work for six weeks starting June 2, 2016. R. at 321. Dr. Parisi diagnosed carpal tunnel syndrome and lesion of the ulnar nerve of the right upper limb and prescribed physical therapy two to three times per week for six weeks. R. at 322.

On June 2, 2016, Dr. Parisi noted that Moore was right-hand dominant and performed a right carpal tunnel release and right ulnar nerve decompression at the cubital tunnel and submuscular anterior transposition. R. at 442-44. At a June 8, 2016, follow up appointment, Moore reported minimal improvement with continuing pain that ranged from "2-10" on a scale of "0-10." R. at 448. On examination, Moore had mild ecchymosis and minimal swelling, and he had full range of motion and full strength to digit extension, flexion, abduction, and adduction. R. at 450. Dr. Parisi advised Moore to modify activities to avoid pain and injury and continue his home exercise plan. R. at 450.

5

Moore returned on June 13, 2016, complaining of pain. R. at 453. Dr. Parisi removed his sutures and noted that he was healing well and had a slightly limited range of motion in his right hand. R. at 454-55. Moore returned for cast removal on June 24 and reported that he had no pain in his right hand or elbow. R. at 468. Dr. Parisi noted that he had full strength in his right wrist and elbow, with no instability, but limited range of motion in the wrist. R. at 459.

Moore saw endocrinologist Dr. Margaret Apedo on July 20, 2016, for hypoglycemia. R. at 537. Dr. Apedo noted that Moore now had an insulin pump, but Moore reported that he continued to have hypoglycemic episodes in the afternoons when he was "active outdoors at work." R. at 537. Moore reported having had two major hypoglycemic episodes in the last six months. R. at 537.

On July 22, 2016, Moore returned to Dr. Parisi with slightly improved symptoms. R. at 470. He had a full range of motion, good strength, and normal sensation in his right wrist and elbow, with moderate tenderness and swelling of the elbow. R. at 472. Dr. Parisi gave Moore a note saying he could not work for two weeks. R. at 474. Moore returned to Dr. Parisi on July 28, 2016, and Dr. Parisi recommended that Moore remain off from work for another two weeks. R. at 480. On August 8, Dr. Parisi gave Moore another note saying that he could not work for two weeks. R. at 486.

Moore received Mobile Life Support services on July 28, 2016, for low blood sugar. R. at 509. He reported that his blood glucose level had dropped to 30 mg/dL after working outside in the heat for an extended time, and that his girlfriend noticed that he was confused. R. at 509. After eating a snack, Moore's blood glucose rose, and he became alert, and he refused further medical attention. R. at 509.

Moore received Mobile Life Support Services for another hypoglycemic episode on August 11, 2016; after receiving glucose, he became alert and oriented and refused transport to the hospital. R. at 510-11.

Moore returned to Dr. Apedo on August 12, 2016 and reported his two recent hypoglycemic episodes. R. at 535. Dr. Apedo titrated his insulin pump. R. at 535.

On August 17, 2016, Moore saw Dr. Parisi and reported that his home exercise program and occupational therapy had been helpful, but that he continued to experience stiffness in his right hand. R. at 495. On examination, Moore had full range of motion and full strength in his right hand. R. at 497. Dr. Parisi stated that Moore could return to work at full duty with no restrictions as of August 18, 2016. R. at 497.

On September 27, 2016, Moore returned to Dr. Parisi and reported that he was still waking up with right hand stiffness, which caused some pain, and that he was unable to continue therapy due to his work schedule. R. at 502. On examination, Moore could make a full fist with his right hand and had full range of motion and full strength. R. at 504.

On January 16, 2017, Moore was treated by Mobile Life Support Services. R. at 512-13. He was conscious but not alert or oriented when medics arrived. R. at 513. With one tube of oral glucose, he became alert and oriented and refused further treatment. R. at 512-513.

Moore returned to Dr. Apedo on February 1, 2017, for insulin pump titration. R. at 533. Moore reported that he no longer had frequent hypoglycemic episodes. R. at 533. He was referred to his primary care provider for right leg pain. R. at 534.

On February 3, 2017, Moore had a hypoglycemic episode and received Mobile Life Support services; he again refused to go to the hospital. R. at 515-516. Moore also received Mobile Life Support services for hypoglycemia on July 26, September 28, and November 11, 2017. R. at

517-19, 520-22, 523-25. His symptoms resolved after eating or receiving glucose. R. at 517-519, 520-22, 524-25.

Moore returned to Dr. Apedo on December 24, 2017. R. at 531-32. He explained that he disconnected his insulin pump at night because he had hypoglycemic episodes only in the morning, and that he occasionally woke up with low glucose. R. at 531. He also reported paresthesias and leg pain at night. R. at 531.

3. Opinion Evidence

a. Dr. Neal Berger (psychologist)

Consultative psychologist Dr. Neal Berger examined Moore on November 30, 2015. R. at 301-06. Moore reported that he worked as a car detailer on at least a part-time basis but was currently on leave after sustaining injuries in a car accident on November 5, 2015. R. at 301. Moore denied any history of hospitalizations for psychiatric reasons, or any outpatient or in-patient treatment for psychiatric symptoms. *Id*. Moore reported that, since being released from prison in March 2015, he has felt overwhelmed, depressed, and anxious; has been socially withdrawn difficulty; and has had low energy and difficulty concentrating. R. at 301-02. Moore stated that he could dress, bathe, and groom himself, but that his girlfriend did the cooking, cleaning, laundry, and shopping even before he hurt his arm in the car accident. R. at 304. Moore added that he could drive for at least short distances and did not like being around people that much. R. at 304.

On mental status examination, Moore was cooperative and fully oriented, and related adequately. R. at 303. Moore had appropriate eye contact, lethargic motor behavior, flat and depressed affect, dysthymic mood, clear sensorium, fluent speech, adequate expressive and receptive language, mildly impaired attention and concentration, mildly impaired recent and

remote memory, borderline cognitive functioning but with a general fund of information that was appropriate to experience, and fair insight and judgment. R. at 303-04.

Dr. Berger assessed that Moore could follow and understand simple directions and instructions, perform simple tasks independently, learn new tasks, and make appropriate decisions. R. at 304. Dr. Berger also assessed mild limitations in Moore's ability to maintain attention and concentration; moderate limitations in his ability to maintain a regular schedule, perform complex tasks independently; and marked limitations in his ability to relate adequately with others and appropriately deal with stress. *Id*. Dr. Berger remarked that the results of the examination appeared to be consistent with psychiatric problems that may significantly interfere with Moore's ability to function on a daily basis. *Id*. Dr. Berger diagnosed major depressive disorder with psychotic features, social anxiety disorder, and posttraumatic stress disorder, and a history of substance abuse disorder. R. at 304-05. His prognosis was fair. R. at 305. Dr. Berger also recommended that Moore receive individual psychological therapy and psychiatric intervention and assistance to manage his own funds. *Id*.

b.  Dr. George Wootan (internist)

Internist Dr. George Wootan conducted a consultative examination of Moore on February 10, 2016. R. at 311-16. Moore reported having injured his right hand in 2015 and that he continued to feel pain and had difficulty closing his hand. R. at 311. Moore also reported a history of hypertension, diabetes, cataracts, glaucoma, retinopathy, and a heart attack, including the placement of stents in 2007, but he did not report any current difficulties associated with those conditions. *Id*. Moore stated that he could shower and dress himself, cooked, cleaned, did laundry, shopped once a month, and watched TV, listened to the radio, and read. R. at 312.

On examination, Moore's heart had a regular rhythm, with no audible murmur, gallop or rub. R. at 313. He had full range of motion in the cervical and lumbar spine, with negative straight-leg raising bilaterally. *Id.* He also had full range of motion in the shoulders, elbows, forearms, wrists, hips, knees, and ankles bilaterally. *Id.* On the right hand, the first, second, and fourth fingers did not close completely, and although he had good strength, he could flex the fingers only so far. *Id.* Moore had no neurological deficits or muscle atrophy, with full strength noted in the upper and lower extremities. *Id.* Moore also had full grip strength and intact hand and finger dexterity. R. at 314. Dr. Wootan assessed that Moore had no restrictions with kneeling, reaching, bending, climbing stairs, walking, standing, or sitting; mild limitations with carrying and lifting with the right hand; and a moderate limitation with handling with the right hand. *Id.*

   c.   Dr. John Caruso (internist)

Consultative internist Dr. John Caruso examined Moore on January 2, 2018. R. at 541-47. In his report, Dr. Caruso noted Moore's report that he did not know how to cook, but could prepare simple meals for himself, and that he could do light cleaning on a daily basis, and that he showered, dressed, and bathed himself daily. R. at 544. He said he did not know how to shop or do laundry. *Id.* Moore also reported using an insulin pump on a daily basis. *Id.*

On examination, Moore had an antalgic gait favoring his right leg and had difficulty walking on his heels, but he could walk on his toes and perform a half squat. R. at 544. He needed some assistance changing for the examination but not getting on or off the examination table, and he rose from a chair without difficulty. *Id.* His hearing was slightly diminished, and his vision was 20/25 using both eyes. R. at 544-45.

Moore's heart had regular rhythm with no audible murmur, gallop, or rub. R. at 545. He had full range of motion in the cervical and lumbar spine except that he had seventy degrees of

lumbar flexion and fifteen degrees of lumbar extension backwards. *Id*. Straight-leg raising was negative bilaterally in the supine and sitting position except at fifteen degrees on the left in the sitting position. *Id*. Shoulder forward elevation "was almost full at 140 degrees bilaterally; therefore, he demonstrated very mild limitations with reaching above his head." R. at 545-46. Shoulder abduction and adduction was full bilaterally, and internal rotation was thirty-five degrees bilaterally. R. at 546. Moore had full range of motion in the elbows, forearms, and wrists. *Id*. In the hips, flexion and extension was eighty degrees on the right and sixty degrees on the left; interior rotation was twenty degrees bilaterally; exterior rotation was full bilaterally; abduction was full on the right and twenty degrees on the left; and adduction was full on the right and ten degrees on the left. *Id*. Flexion and extension of the knees was eighty degrees bilaterally. *Id*. Ankle dorsiflexion and plantar flexion were slightly limited at sixty degrees. *Id*. Neurological examination demonstrated diminished deep tendon reflexes in the elbows, knees, and ankles bilaterally, but no sensory deficits were observed except for slightly diminished sensation in the lower left extremity. *Id*. Strength in the upper and lower extremities was intact bilaterally, and Moore had no muscle atrophy. *Id*. Hand and finger dexterity was intact on the left but slightly diminished on the right, which also showed moderate difficulty with fine motor coordination and mild limitations for grasping and holding. R. at 546-47.

Dr. Caruso assessed a mild limitation with seeing, hearing, bending (but not twisting), reaching above the head, and grasping and holding with the left hand. R. at 548. Dr. Caruso assessed mild limitations with fine motor coordination of the hands and fingers, particularly with the right hand, noting that "only with tying laces did he demonstrate moderate difficulties." *Id*. Dr. Caruso found no limitation with twisting, lifting or carrying heavy objects, pushing or pulling,

climbing stairs, or rising from a chair. *Id*. He also assessed a moderate limitation with kneeling. *Id*.

In a medical source statement prepared that same day, Dr. Caruso, opined that Moore could sit, stand, or walk for up to two hours each without interruption and for a total of three hours each in an eight-hour workday, and that he could lift and carry up to twenty pounds occasionally. R. at 549-50. Dr. Caruso remarked that Moore had a deformity and limited strength and grasping in the right hand after the injury. R. at 549. He also opined that with his right hand, Moore could occasionally reach overhead and in other directions, and occasionally handle, finger, feel, push, and pull; and that with his left hand, Moore could frequently reach overhead and in other directions, and frequently handle, finger, feel, push, and pull. R. at 551. Finally, Dr. Caruso opined that Moore could frequently climb stairs and ramps, and occasionally balance, stoop, kneel, crouch, and crawl. R. at 552.

4. Hearing Testimony

On December 13, 2017, a hearing was held before ALJ Brian W. Lemione. Moore appeared at that hearing pro se. Moore, Vocational Expert Louis Szollosy, and Jennifer Burnley, Moore's girlfriend, testified.

a. Moore's Testimony

Moore testified that he was currently unemployed. He had held two jobs in 2017. One position was a teacher's aide at the Green Chimney School, where he assisted autistic elementary school children. R. at 41. Moore held that position for a month before his criminal record came to the school's attention and he was terminated. R. at 41. Moore also held a position as a delivery person on a paper route for one month and one week. R. at 41-42. He was terminated from that position after a hypoglycemic episode. R. 42.

12

In 2015 and 2016, Moore testified that he held a position as a car detailer at a company doing business as Heeley Brothers. R. at 45. He worked for this company before and after his automobile accident. After the accident, he was terminated because he could not perform his work tasks with his injured hand. R. at 46. Moore also worked at the Gap Warehouse on a seasonal basis. R. at 47-48. Moore was terminated from the Gap Warehouse after he passed out from hypoglycemia. R. at 48. Moore testified that he received a small settlement in compensation for being terminated based on his health condition. R. at 48. Moore also may have worked off-books jobs since his release from prison but could not recall specifics. R. at 49. These off-books jobs included helping people move things or work around the house. R. at 57.

When asked about his use of his right hand in the wake of his automobile accident, Moore testified and demonstrated to the ALJ that he could not make a fist. R. at 44. He testified that he could not grip a pen to write his name and scribbled when he needed to make a signature. R. at 45. Were he to need to pick up change from a counter, he would use one hand to slide it the other hand. R. at 45.

When asked about his diabetes, Moore testified that he had an insulin pump implanted in 2015, after the car accident. R. at 50-51. Though the pump was intended to mitigate drops in his blood sugar, Moore testified that even with the pump his blood sugar "drops tremendously". R. at 51.      To manage his diabetes, he checks his blood sugar about five times a day. R. at 51. These drops sometimes happen overnight, although Moore eats a snack before bed to try to prevent this. R. at 51. Moore testified that this has at time prevented him from attending work the following day. R. at 52.

On the topic of his mental health, Moore testified that he experiences shame around the topic. R. at 52. He has not gone to the doctor for any mental health problems and takes no

medication. R. at 52. He testified that his wife urged him to get help because she believed he needs medication, but that he is afraid to do so. R. at 52. This fear stems from a concern that his kidneys, which function poorly, could not tolerate medication beyond what he already takes. R. at 53.

Moore testified that his daily activity on an average day includes bringing his girlfriend's children to school, taking laundry up and down the stairs, and cooking. R. at 56. Moore also looks for jobs, which he may only be able to hold down for a short period because of his health issues. R. at 67. Burnley pays the household expenses and Moore is on her health insurance. R. at 57. He has tried to get unemployment after termination, but usually has not worked long enough to qualify. R. at 58. He has received welfare at times, but discontinued receipt when employed. R. at 58.

The ALJ also noted that the file was weighted toward records pertaining to Moore's hand and facilitated the receipt of further records from the doctor managing Moore's diabetes. R. at 54, 241, 245. The ALJ also ordered Moore to get another consultative examination, because the prior one was somewhat old at the time of the hearing. R. at 55.

b.  Szollosy Testimony (vocational expert)

The ALJ told Szollosy that he had concluded that Moore's prior work was not substantial gainful activity, so they would not address Moore's prior work experience. R. at 60.

At the ALJ's prompting, Szollosy testified to about employment opportunities for two hypothetical persons with the same age, education and work history as Moore. The first hypothetical person was limited to a range of light exertional work with the additional limitation of frequent fine and gross manipulation with the right dominant hand. R. at 61. Based on that hypothetical, the vocational expert indicated possible titles from the Dictionary of Occupational Title: Packager or Packer, Dot No. 737.687-094, with 700,000 positions; Racker, DOT No.

524.687-018, with 400,000 positions; and Router, DOT No. 222,587-038, with 2,900,000 positions. R at 61-62.

The second hypothetical person was limited to no more than occasional fine and gross manipulation with the hand and fingers. R. at 62. Szollosy referred to the Dictionary of Occupational Titles and concluded that for such hypothetical person would be precluded from the Packer position. R. at 62. That person would be able to work as a Sorter, DOT No. 529.686-186, with 35,000 positions. R. at 63.

The ALJ added that the hypothetical person would be absent one day a month. Szollosy answered based on his 30 years of experience that this would be tolerated up to a certain extent but "if [the monthly absence] went on for an extended period, especially in unskilled work" it would erode some career opportunity, but not preclude competitive employment. R. at 63 . This was because in unskilled work, "it's crucial that people be available at the worksite". R. at 63. When asked what the impact of such a person being absent two or more days a month, Szollosy indicated, based on his 30 years of experience, that it "would definitely be problematic and actually preclude competitive employment". R. at 63. Szollosy also indicated that a need to be "off task 15% or more of the workday" would make employment unsustainable, and a pattern of being off task 10% or greater would cause termination. R. at 64. He also opined that having a criminal record would reduce the number of available jobs, but there would still be available jobs. R. at 66. Szollosy acknowledged a prison record might preclude employment at a school. R. at 68.

c.   Burnley testimony

Burnley testified that Moore changed the doctors that manage his diabetes after his car accident, which occurred because he had blood drawn at his old provider, his blood sugar was not

checked before the end of the appointment, and he had abnormal insulin levels that cause him to pass out behind the wheel. R. at 69.

During Burnley's testimony the ALJ requested that she and Moore provide him the contact information for the doctors that manage his diabetes so the ALJ could request further records. R. at 70-71. He also added that Moore should consider revising the onset date to the date when he got the insulin pump. R. at 71. The ALJ advised Burnley and Moore they should contact his case assistant if they wish to amend the onset date.

When asked whether she thought Moore could hold a full-time job, Burnley answered that Moore "has really, really tried". R. at 72. She said that he lost his job at Heeley Brothers because of diabetes, R. at 72. This is in contrast to Moore's testimony that he lost that position because he could not perform his detailing duties in light of his hand injury. Burnley also testified that Moore's diabetes had grown more difficult to control. R. at 72-73.

She testified to Moore's problems arising from his time in prison. He has difficulty sleeping, and at time sleeps in the bathroom. R. at 74. He is very jumpy and irritable around loud noises such as slamming doors. R. at 74. He tends to hoard food and cosmetics and is not comfortable eating besides in a room with a closed door. R. at 74.

5. ALJ Hearing Decision

Applying the five-step sequential evaluation for adjudicating Social Security disability claims, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since August 17, 2015, his SSI application date. R. at 12. At step two, the ALJ found that Plaintiff had the following severe impairments: insulin-dependent diabetes mellitus, status post fracture to the first, fourth, and fifth fingers of the right hand, right cubital and carpal tunnel syndromes, hypertension, and diabetic neuropathy. R. at 13. At step three, the ALJ found that Plaintiff did not

have an impairment or combination of impairments that met or medically equaled the severity of any impairment listed at 20 C.F.R. Part 404, Subpart P, App'x 1 (the "Listings"). R. at 13. Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 416.967(b), except that he was limited to no more than frequent fine and gross manipulation with the right dominant hand and fingers. R. at 14. At step four, the ALJ found that Plaintiff had no past relevant work. R. at 20. At step five, the ALJ considered Plaintiff's age, educational and vocational background, and RFC, as well as the VE's testimony and the Medical-Vocational Guidelines 204.00, set forth at 20 C.F.R. Part 404, Subpart P, Appendix 2, which provided a framework for decision-making. R. at 21-22. The ALJ concluded that there were jobs in significant numbers in the national economy that Plaintiff could perform. R. at 22. The ALJ therefore found that Plaintiff was not disabled within the meaning of the Act. *Id*.

## STANDARD OF REVIEW

A district court reviews a Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c)(3) to determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard. *Talavera v. Astue*, 697 F.3d 145, 151 (2d Cir. 2012). "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted).

"Where, as here, the claimant is unrepresented by counsel, the ALJ is under a heightened duty 'to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.' Hankerson *v. Harris*, 636 F.2d 893, 895 (2d Cir. 1980) (quoting *Gold v. Secretary of HEW, supra*, 463 F.2d at 43). A reviewing court must determine whether the ALJ 'adequately protect[ed] the rights of [a] pro se litigant by ensuring that all of the relevant facts [are] sufficiently developed

and considered.' *Hankerson, supra*, 636 F.2d at 895." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) .

A reviewing Court is "not bound to sustain a denial of disability benefits where the applicant has raised a serious question and the evidence affords no sufficient basis for the Secretary's negative answer." *Kerner* v. *Fleming,* 283 F. 2d 916, 922 (2d Cir. 1960).

## COMMISSIONER'S DETERMINATION OF DISABILITY

A disability, as defined by the Social Security Act, is one that renders a person unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) *accord* 42 U.S.C. § 1382c(a)(3)(A). Further, "[t]he impairment must be 'of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" *Shaw v. Chater*, 221 F.3d 126, 131-32 (2d Cir. 2000) (quoting 42 U.S.C. § 423(d)(2)(A)). Proof of disability can be gleaned from several factors: objective medical facts; diagnoses or opinions based on these facts; subjective evidence of pain and disability testified to by claimant and family members or others; and claimant's educational background, age, and work experience. *Marcus* v. *Califano,* 615 F. 2d 23, 26 (2d Cir. 1979); *Bastien* v. *Califano,* 575 F. 2d 908, 912 (2d Cir. 1978).

The Commissioner uses a five-step process to determine whether a claimant has a disability within the meaning of the Social Security Act. *Curry v. Apfel*, 209 F.3d 117, 122 (2d Cir. 2000); *see* 20 C.F.R. §§ 404.1520(a)(4). First, the Commissioner determines whether the claimant is employed. *Curry*, 209 F.3d at 122. Second, if the claimant is unemployed, the Commissioner

18

considers whether the claimant has a "severe impairment" that "significantly limits his physical or mental ability to do basic work activities." *Id.* Third, if the claimant suffers from such an impairment, the Commissioner determines whether that impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of the Social Security Act regulations, meaning it conclusively requires a determination of disability. *Id.*; *see also* 20 C.F.R., Part 404, Subpart P, App'x 1. If the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity ("RFC") to perform her past work. *Curry*, 209 F.3d at 122. Finally, if the claimant is unable to perform his past work, the Commissioner determines whether there is other work which the claimant could perform. *Id.*

"The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and 'bears the burden of proving his or her case at steps one through four.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citations omitted). At step five, however, "the burden shifts to the Commissioner to show that there [are] a significant number of jobs in the national economy that [the claimant] could perform based on his residual functional capacity, age, education, and prior vocational experience." *Butts v. Barnhart*, 388 F.3d 377, 381 (2d Cir. 2004) (citing 20 C.F.R. § 404.1560).

## DISCUSSION

Moore argues that the ALJ's RFC is not supported by substantial evidence; and that the ALJ incorrectly assessed the medical evidence of record and the credibility of Moore and Burnley. Although the Court does not find some of Moore's objections meritorious, it does conclude the ALJ failed to develop the record in several important ways and, at times, to consider facts already in the record. The Court will therefore remand for further proceedings consistent with this Opinion.

1.  Residual Functional Capacity and Medical Evidence

"[Residual functional capacity] is not the least an individual can do despite his or her limitations or restrictions, but the most." SSR 96–8P, 1996 WL 374184 (July 2, 1996) (emphasis in original); *accord* 20 C.F.R. § 416.945(a)(1). In determining a claimant's RFC, the regulations state that an ALJ will consider "all the relevant evidence in [a claimant's] case record." 20 C.F.R. § 416.945(a)(1). Here, the ALJ determined that Plaintiff could perform light work[2] with a limitation to no more than frequent fine and gross manipulations with the right hand. R. at 14.

Moore argues that the ALJ erred in concluding that Moore could do frequent fine and gross manipulations with his right hand. Specifically, Moore argues that the ALJ gave insufficient weight to the opinions of the occupational and physical therapists that worked with him after the accident, and the opinion of Dr. Caruso, which both point toward greater limitations. The ALJ explicitly discounted these sources in favor of Dr. Parisi's records. The ALJ gave the occupational and physical therapist opinions lesser weight because "they are not an acceptable medical source and as the ultimate issue of inability to work is a decision reserved to the Commissioner". R. at 17. The ALJ gave lesser weight to Dr. Caruso's opinion because "it [was] based more on the claimant's self-report and history, and not based on objective signs, symptoms, and findings" and was "inconsistent with the treating records and opinions", namely that of Dr. Parisi. R. at 20.

---

[2] "The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing and walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work." SSR 83-10.

The Court concludes that even if Moore is correct this would be harmless error. Although the ALJ's official conclusion was that Moore could do frequent fine and gross manipulation with his right hand and fingers, he also had the vocational expert consider a hypothetical person who could do only limited fine and gross manipulation with his or her hand or fingers. Because the ALJ considered these greater limitations in the alternative, the Court finds his conclusion regarding frequent fine and gross hand manipulations was, if anything, harmless error.[3] *See McIntyre v. Colvin*, 758 F.3d 146, 152 (2d Cir. 2014) (applying harmless error analysis.).

Moore argues that the ALJ erred by giving insufficient weight to Dr. Caruso's report in another regard. Dr. Caruso opined that Plaintiff could sit, stand, and walk for two hours uninterrupted, but for no more than 3 hours per day. He also found that Moore could lift ten pounds frequently; lift 11 to 20 pounds infrequently; and carry weight up to 20 pounds only occasionally. Moore says this demonstrates there is not substantial evidence that Moore can meet the standing and walking requirements of light work. The Court agrees.

"[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday". SSR 83-10. "Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. *Id*. Though in Dr. Caruso's opinion Moore could stand or walk for 3 hours each, it is not clear this would allow Moore to do a job that required 6 hours on his feet where standing was more critical. Further, the ALJ did not ask the vocational expert whether the jobs the hypothetical person with Moore's profile could hold were feasible if that person can only stand for three hours total in a day.

---

[3] For the same reason, Moore's contention that the ALJ failed to make sure that the available jobs to which Szollosy offered were consistent with Moore's limitations. The ALJ did prompt Szollosy to consider jobs with only occasional fine finger work.

Nor is the fact that Moore does certain household tasks, on which the ALJ relied heavily, substantial evidence that Moore is capable of the on-your-feet requirements of light work. An ALJ may conclude that daily activities, such as childcare, driving, and housework, weigh against the credibility of a plaintiff's subjective complaint of pain. *Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir. 2009). However, nothing among the activities in which Moore reports he engages—taking children to school, carrying laundry, etc.—indicates that he can stand any more than Dr. Caruso opined. Moreover, records from Dr. Apedo indicate that Moore had problems with his legs because of his diabetes. *See* R. at 531, 534. The ALJ did not consider how that might impact Moore's ability to do light work. Further development is needed.

The Court also finds error in the ALJ's conclusions regarding Moore's mental health. The ALJ concluded that Moore only had mild limitations in the four broad areas set out in the disability regulations for evaluating mental disorders: understanding, remembering, and applying information; interacting with others; concentrating, persisting and maintaining pace; and adapting and managing oneself. R. at 13. In weighing the record evidence regarding Moore's mental health, the ALJ noted that although Moore has a diagnosis from Dr. Berger of PTSD, anxiety and depression, Moore had received no treatment for those, nor any medication, and did not allege mental functional limitations. Moore alleges that this was error. The Court agrees.

The record does not provide substantial support for the ALJ's conclusion that Moore's mental health issues were only mild limitations. Dr. Berger assessed mild limitations in his ability to maintain attention and concentration; moderate limitations in his ability to maintain a regular schedule, perform complex tasks independently; and marked limitations in his ability to relate adequately with others and appropriately deal with stress. R. at 304. Further, Dr. Berger remarked

that the results of the examination appeared to be consistent with psychiatric problems that may significantly interfere with Plaintiff's ability to function on a daily basis. R. at 304.

The testimony of Moore and Burnley exacerbates rather than assuages concerns about the possible impact of Moore's mental health on his ability to work. When Moore was asked about his mental health he largely demurred, citing embarrassment on the topic. However, he stated that his wife urged him to get help because she believed he needs medication, and he is afraid to do so. R. at 52. He explained that this fear stems from a concern that medication may be addictive or that his kidneys, which function poorly, could not tolerate medication beyond what he already takes. R. at 53. Burnley testified to Moore's problems arising from his time in prison. He has difficulty sleeping, and at time sleeps in the bathroom. R. at 74. He is very jump and irritable around loud noises such as slamming doors. R. at 74. He tends to hoard food and cosmetics and is not comfortable eating besides in a room with a closed door. R. at 74.

The ALJ should have inquired further into Moore's mental health issues, rather than concluding his lack of treatment, which Moore explained, was a reason to discount them. It was also not clear from the record if Moore had experienced problems at work based on his mental health challenges. It was error not to develop the record on this point as well.

The Court also concludes further consideration of Moore's diabetes must be made. Moore asserts the ALJ improperly weighed evidence from Dr. Wootan and Dr. Parisi because they did not address Moore's diabetes. However, the ALJ was fully aware that these records did not provide a full picture into Moore's diabetes and sought further records from the doctor managing Moore's diabetes after the hearing. R. at 54, 241, 245.These are Exhibits B84F, R. at 530-38; B85F, R. at 539-540; and B86F, R. at 542-555. The better question is whether the ALJ's conclusions regarding

Moore's impairment from diabetes was supported by substantial evidence anywhere in the record. The Court concludes it was not.

The ALJ made limited specific reference to Moore's diabetes in his opinion. The ALJ mentioned that "the claimant was noted to be working outside in the heat for an extended period of time in 2016 when his blood glucose dropped" and "quickly recovered and did not wish to go to the hospital", R. at 19. The ALJ observed that Moore "testified he has diabetic episodes at night, but the medical record shows he disconnects his insulin pump at night and only occasionally wakes up with low glucose levels." R. at 20. The ALJ does not explicitly discuss Moore's repeated receipt of emergency services for hyperglycemic incidents, which is well documented in the record.

The Defendant contends that there is substantial evidence for the conclusion that Moore's diabetes did not cause ongoing functional limitations because his hypoglycemic "episodes tended to resolve immediately after Plaintiff ate something or received glucose, and Plaintiff regularly refused further medical care.[4]" D's Mot. at 21. Based on this, Defendant urges the Court to conclude Moore's "episodes plainly did not occur frequently enough to interfere with [his] ability to perform substantial gainful activity, which is further supported by Plaintiff's own report that he was working during these episodes." D's Mot. at 22.

The ALJ's consideration of Moore's diabetes and the reasoning Defendant offers to bolster the ALJ is inadequate for reasons articulated by the vocational expert, Szollosy. Szollosy explained two scenarios in which a person of Moore's profile might not be able to find competitive employment or be terminated. When asked what the impact of such a person being absent two or

---

[4] The Court notes that the ALJ did not inquire into why Moore refused treatment after his hyperglycemic episodes. Before a negative inference may be drawn from this fact, the ALJ is obligated to inquire why Moore has not sought treatment. *See Thornton v. Comm'r of Soc. Sec.*, No. 18-CV-0718MWP, 2020 U.S. Dist. LEXIS 23466, at *10 (W.D.N.Y. Feb. 11, 2020) (collecting cases).

more days a month, Szollosy indicated, based on his 30 years of experience, that it "would definitely be problematic and actually preclude competitive employment". R. at 63. Szollosy also indicated that a need to be "off task 15% or more of the workday" would make employment unsustainable, and a pattern of being off task 10% or greater would cause termination. R. at 64. The observation that Moore recovers relatively quickly from hypoglycemic episodes misses the question of how such episodes impact his ability to work. Indeed, Moore testified to losing at least two jobs because of such episodes: mail route delivery and the Gap Warehouse. The ALJ did not consider whether Moore's pattern of hypoglycemic incidents, or even the routine upkeep required to monitor his condition, would rise to the levels the vocational expert indicated would preclude employment or lead to termination. The ALJ must make this inquiry on remand.

This brings the Court to an overarching error in the ALJ's reasoning. Second Circuit "case law is plain that 'the combined effect of a claimant's impairments must be considered in determining disability; the [Commissioner] must evaluate their combined impact on a claimant's ability to work, regardless of whether every impairment is severe." *McIntyre v. Colvin*, 758 F.3d 146, 151-52 (2d Cir. 2014) (citing *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995)). The ALJ's failure to develop the record and properly consider Moore's other impairments, means that he could not have properly considered them in combination with the limitations Moore suffers with his hand. The Court directs the ALJ to make this required holistic assessment on remand.

2.   Credibility Assessments and Remaining Objections

Moore also takes issue with the ALJ's inference that Moore's work history shows a lack of motivation to work. Moore argues this inference is unfair and unsupported in the face of Moore's repeated efforts to get work, even if temporary. Mot. at 22 (citing R. at 57.). It is not entirely clear on what aspect of Moore's history the ALJ relies to infer that he is unmotivated to

work. However, there are aspects of his history that the Court can say do not provide substantial support for such an inference.

To the degree the ALJ relied on Moore's gap in employment because of his imprisonment to indicate of lack of motivation to work, the Court disagrees. The record indicates Moore was incarcerated for 20 years, with his last release date in 2015. R. at 43, 186. He had no opportunity to be in the job market during those years. To the degree the ALJ's inference relies on Moore being terminated from prior jobs because of his health conditions (like being terminated from the Gap Warehouse or paper route after hypoglycemic episodes) or because of his criminal record (such as his termination from the Green Chimney School), it is unsupported. There is nothing in the record to indicate Moore's motivation or job performance contributed to his involuntary separation from those jobs.

Moore argues it was error for the ALJ to conclude that the levels of pain he reported were inconsistent with the record showing improvement after surgery and no medical treatment after December 2017. Mot. at 21 (citing R. at 20). While an ALJ is required to take Plaintiff's reports of pain and other limitations into account, she is not required to accept a claimant's subjective complaints without question. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). The ALJ cited specific inconsistencies between the record and Moore's testimony that permit the inference that Moore at times overstated the impairment from his hand. The Court therefore finds no error in the ALJ's credibility assessment.

Moore argues it was error for the ALJ to rely on his appearance at the hearing, where the ALJ assessed that Moore did not appear to be in pain or have trouble sitting as evidence of lesser pain severity. Mot. at 22 (citing R. at 20, 34, 76). The ALJ noted that he "did not rely solely on [Moore's] appearance in assessing the consistency of his symptoms, but [it] is one factor among

many that can be considered." R. at 20. As a general matter, an ALJ may "take account of a claimant's physical demeanor in weighing the credibility of her testimony as to physical disability." *See Gates v. Astrue*, 338 F. App'x 46, 49 (2d Cir. 2009) (quoting *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998)). The Court sees no error in the ALJ doing so here.

Moore also argues it was error for the ALJ not to inquire further into Szollosy's opinion regarding the impact of Moore's criminal record on his employment prospects. The Court disagrees that further inquiry into this was necessary as it does not bear on Moore's work limitations arising from his disabilities.

Moore argues that the ALJ erred because although he indicated that he would consider granting disability as of the date Plaintiff acquired his insulin pump, he did not follow up with Moore, who was pro se, to see if he wished to use an earlier onset date. Mot. at 23 (citing R. at 70). The ALJ gave Moore directions to contact his case manager if Moore wished to change the onset date. Moore apparently did not do so, though he was in touch with the ALJ after the hearing with regard to the additional documents related to diabetes that were added to the record. Moore provides no authority for requiring the ALJ to proactively reach out to Moore about this question. The Court declines to impose one.

## CONCLUSION

For the reasons above, Plaintiff's motion is GRANTED, and Defendant's motion is DENIED. The Court hereby remands this matter for further proceedings. The Clerk of Court is hereby directed to close this case.

**SO ORDERED.**
**Dated: September 30, 2020**
        **New York, New York**

**ANDREW L. CARTER, JR.**
**United States District Judge**